UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

BROWN & BROWN INSURANCE SERVICES, INC.,

    *Plaintiff*,

v.

HITESH PATEL and FLOW SPECIALTY INSURANCE, INC.

    *Defendants*.

Civil Action No.: 6:24-cv-2189

## COMPLAINT

Plaintiff, BROWN & BROWN INSURANCE SERVICES, INC., ("Brown & Brown" or "Company"), by and through its attorneys, hereby files this Complaint and Jury Trial Demand (the "Complaint") against Defendants Hitesh Patel ("Patel") and Flow Specialty Insurance, Inc. ("Flow") (collectively with Patel, "Defendants") and alleges as follows:

## NATURE OF THE ACTION

1.  In this action for breach of contract, misappropriation, tortious interference with contract, and tortious interference with prospective business relations, Brown & Brown seeks a declaratory judgment, injunctive relief, and damages arising out of the solicitation of its customers by former Senior Vice President of Casualty Lines, Hitesh Patel, in violation of his contractual and fiduciary obligations to the Company, and Flow's aiding and abetting of these violations.

2.  Brown & Brown is an insurance brokerage firm that operates primarily in Volusia County, Florida.

3.  From approximately December 2017 to September 30, 2020, Patel was an employee of Amity Insurance Agency, Inc. ("Amity").

1

4. On August 1, 2020, Brown & Brown acquired substantially all of the assets of Amity. In connection with and upon completion of the acquisition, Patel entered into an employment agreement ("Agreement") with Brown & Brown dated August 1, 2020. *See* **Exhibit "A."**

5. From August 1, 2020 to May 17, 2024, Patel was a Senior Vice President of Casualty Lines for Brown & Brown. In his role, Patel was responsible for securing professional liability policies for law firms. Patel worked both directly as a retail broker with law firms, and in a wholesale capacity directly with carriers.

6. Patel's position was one of significant trust and responsibility, and provided Patel with access to extensive client, strategic, and trade secret information.

7. The terms of the Agreement between Brown & Brown and Patel prohibited Patel from competing with the Company during his employment, and from soliciting any Company clients or prospective clients for a two-year period after his employment with the Company ended.

8. Nonetheless, following his resignation, Patel went to work for a competitor of Brown & Brown and has solicited multiple Brown & Brown clients.

9. Upon further investigation, Brown & Brown discovered that Patel had emailed to himself Company documents containing contact information for Brown & Brown's clients.

10. Upon information and belief, Patel engaged in this course of conduct in order to gain a competitive advantage over Brown & Brown.

11. Upon information and belief, Patel has and will continue to use Brown & Brown's confidential and trade secret information to solicit Brown & Brown's customers and improperly divert business for his personal benefit.

## THE PARTIES

12. Brown & Brown is a Florida Corporation with its principal place of business at 300 North Beach Street, Daytona Beach, FL 32114. Brown & Brown is a provider of insurance and risk management services.

13. Defendant Patel is an individual residing, upon information and belief, in Lakeway, Texas.

14. Defendant Flow is a Delaware corporation with a principal place of at 196 Castro Street, Suite A, Mountain View, California 94041. Flow has an active license to transact business in Florida from the Florida Division of Corporations.

## JURISDICTION, VENUE, AND CONDITIONS PRECEDENT

15. This Court has subject matter jurisdiction under 28 U.S.C. 1332(a), and 1367(a).

16. This Court may exercise personal jurisdiction over Defendants pursuant to Fla. Stat. 48.193(1)(a)(1) because they operate, conduct, engage in, or carry on business or business ventures in this state.

17. This Court may also exercise personal jurisdiction over Defendants pursuant to Fla. Stat. § 48.193(1)(a)(2) because Defendants caused injury to Brown & Brown in the state of Florida arising from their acts outside of the state and were engaged in solicitation or service activities within the state at or around the time of the injury, (b) Defendants were engaged in substantial activity within the state and (c) personal jurisdiction over Defendants comports with due process.

18. Venue is proper in this judicial district under 28 U.S.C. § 1391(b)(2).

19. All conditions precedent to the commencement or maintenance of the actions alleged to have occurred or the occurrence of such has been waived by the Defendants' actions.

20. The Plaintiff has performed all obligations under the contract alleged, or such performance has been waived by Patel's breach of contractual or common law obligations.

21. The Plaintiff has retained the undersigned attorneys, is required to pay them a reasonable fee, and is entitled to recover a reasonable fee according to the Agreement and applicable law, including Section 542.335 of the Florida Statutes.

## FACTUAL ALLEGATIONS

*Plaintiff's Business*

22. At all times relevant, the Plaintiff has been engaged in the business of quoting, placing, providing, servicing, and/or renewing insurance products.

23. Patel worked with retail brokers, used wholesale brokers, and wrote retail business in the State of Florida. Throughout his employment with Brown & Brown, he was responsible for managing the relationships of 50 or more of Brown & Brown's clients that were located in Florida.

24. Mr. Patel also possessed a surplus lines license in the State of Florida.

25. Plaintiff's business model relies upon salespeople such as Patel to prospect and manage client relationships, including relationships with insurance carriers and retail brokers who refer business to Brown & Brown.

26. Accordingly, Patel was given access to a considerable amount of confidential information and goodwill regarding Brown & Brown's customer accounts during the term of his employment.

27. Because Plaintiff sells directly to its customers, it views, *inter alia*, the names, price lists, profit margins, purchasing histories, and requirements of customers and potential customers and any hard or electronic documents that contain this information as confidential.

28. Brown & Brown's customer relationships were created and strengthened through significant capital and human investment.

29. Brown & Brown purchased certain client accounts and their associated confidential information—including client accounts associated with Patel—from Amity at great cost.

30. In addition, Brown & Brown provided access to other accounts and confidential information associated therewith directly to Patel once he began working for Brown & Brown.

31. Brown & Brown's successful product and service sales are based, in substantial part, on confidential, proprietary, and trade secret information developed and used by Brown & Brown, as well as trade secrets not disclosed to the general public or to Brown & Brown's competitors, making this information extremely valuable.

***Patel's Employment with the Plaintiff***

32. From December 15, 2017 to August 4, 2020, Patel was employed by Amity.

33. On December 15, 2017, Patel entered into an Option Letter with Amity, whereby Patel could purchase from Amity certain insurance client accounts, or Amity could elect to make an option foreclosure payment upon termination of Patel's employment with Amity other than for cause.

34. Effective August 1, 2020, Patel entered into an Option Termination Agreement with Amity, whereby Patel received a payment from Amity in exchange for the termination of his option to purchase the accounts. Patel agreed that for five years following the effective date, he would (a) keep and maintain as confidential all files, records and other information regarding any products or services quoted or provided for the accounts at issue, and he would not disclose such information other than to Amity or Brown & Brown; (b) not knowingly or recklessly use such information to the competitive disadvantage of Amity or Brown & Brown; (c) not directly or indirectly solicit, divert, quote, propose, sell, place, provide service or renew any insurance products or services to any of the accounts at issue except as permitted by Brown & Brown.

35. Patel further agreed that the covenants contained in the Option Termination Agreement could be enforced by Brown & Brown.

36. Effective August 1, 2020, Amity entered into an Asset Purchase Agreement ("APA") with Brown & Brown.

37. In accordance with the APA, Amity agreed to assign its employees' restrictive covenants to Brown & Brown.

38. On or about August 4, 2020, in conjunction with the sale of assets between Amity and Brown & Brown, and his commencement of employment with Brown & Brown, Patel executed the Employment Agreement with Brown & Brown attached as **Exhibit A**, and thus became a Senior Vice President for Brown & Brown.

39. As a Brown & Brown employee, Patel had access to trade secrets and confidential information developed in, based in, and/or arising from work conducted in Florida, and which were subject to use in accordance with policies developed in Florida.

40. Patel was further subject to a reporting and strategic decision-making structure which was, ultimately, based in Florida.

41. Patel also was paid by a payroll system based in Florida and gained the benefit of human resources, financial, accounting, tax, auditing, marketing, advertising, research, information technology, compliance, purchasing, procurement, databases, and systems, services, technologies, and networks which are based in Florida.

42. Patel's duties for, and obligations to, Brown & Brown encompassed, *e.g.*, quoting, recommending, placing, providing, servicing and renewing property and casualty lines of insurance, with a focus on legal professional liability coverage for law firms.

43. In order to fulfill his responsibilities to Brown & Brown, Patel was entrusted with and had access to Brown & Brown's confidential, proprietary, and trade secret information, including financial information, sales information, sales and marketing strategy information, the

identity and lists of actual and potential customers, profit margins, purchasing histories and requirements of customers and potential customers, marketing information, and other information regarding Brown & Brown's methods, processes, services, customers, operations and business, and information regarding the insurance products required and/or preferred by various of Brown & Brown's customers.

44. Patel was advised of his responsibilities by Brown & Brown, such that he undoubtedly knew that this confidential information was not intended for dissemination.

45. Patel was entrusted with this confidential, proprietary, and trade secret information to create and strengthen customer relationships for Brown & Brown's benefit, and not for the benefit of Brown & Brown's competitors.

46. From its headquarters in Florida, Brown & Brown undertook many measures to prevent the disclosure of its confidential, proprietary, and trade secret information to competitors and others, particularly during and after the course of the acquisition of Amity's assets by Brown & Brown.

47. Brown & Brown has promulgated numerous policies designed to protect this information, which are distributed to its employees.

48. In addition, Brown & Brown employees receive training in information security, are reminded of these rules and policies, and must agree to comply with them every time the employee logs on to their computer.

49. Moreover, Brown & Brown classifies its information based on its relative business value or sensitivity, and grants limited access to any information designated as confidential, proprietary, and/or trade secret information to employees who have a legitimate reason to access such information.

50. In addition to these policies, Brown & Brown also requires employees to execute a written agreement providing, *inter alia*, for the protection and continued confidentiality of Brown & Brown's information and trade secrets, as well as Brown & Brown's goodwill, customer relationships and investment in its employees, during and after their employment.

51. In Patel's case, Brown & Brown required him to sign the Agreement before commencing work for Brown & Brown and thereby gaining access to its confidential and proprietary information, including those contained in its client databases and other servers, at least one of which are housed in Florida.

52. The Agreement contains several restrictive covenants that, *inter alia*, prohibit Patel for two years following his termination from: (a) directly or indirectly soliciting work from any of Brown & Brown's actual or prospective clients with which he had involvement with or regarding which he received confidential information (the "Restricted Accounts"); or (b) interfering or otherwise taking any action to cause any Restricted Account, referral source, insurance carrier, wholesale broker, independent contract, or other person or entity with a business relationship with Brown & Brown to cease, reduce, or refrain from such business relationship. **Exhibit A**, § 5 (b)(i-ii).

53. Furthermore, Patel agreed prior to the final day of his employment with Brown & Brown (the "Termination Date") to return all confidential and proprietary information and trade secrets of Brown & Brown upon the Termination Date or upon demand. *Id.*, § 3(b).

54. Upon information and belief, Patel failed to return all confidential and proprietary information upon his resignation. *Id.*

55. The Agreement also prohibits Patel from misappropriating Brown & Brown's trade secrets or confidential information. *Id.*, § 5(a).

56. The primary purpose of the restrictive covenants contained in the Agreement is to reasonably protect Brown & Brown's legitimate business interests, including but not limited to: (a) the retention of Brown & Brown's clients; (b) the preservation of Brown & Brown's trade secrets and other confidential business information and proprietary information, including information used to assist in the retention of Brown & Brown's current clients, expand business with Brown & Brown's current clients, and secure prospective clients in the future; (c) the protection of Brown & Brown's investment (through Amity) in training and enhancing Patel's skill and experience; and (d) the protection of the goodwill Brown & Brown has created with its current clients and prospective future clients.

57. Patel freely and voluntarily entered into the Agreement, which is both valid and binding in that it: (a) is supported by adequate consideration; (b) does not impose any unreasonable economic hardships on Patel; and (c) is not contrary to public policy.

58. As a Senior Vice President, Patel had intimate knowledge of Brown & Brown's trade secrets and confidential and proprietary information, including without limitation: (a) sensitive customer and financial information; (b) strategic customer relationship management plans and processes; (c) sales territory designs, strategies and deployment; (d) customer buying patterns and preferences; (e) the identity and lists of actual and potential customers; (f) Brown & Brown's sales and marketing strategies for customers; and (g) specialized training and related material.

59. Brown & Brown made reasonable efforts to keep this information secret, including but not limited to: (a) restricting access to this information from all individuals except those who worked for Brown & Brown and who had a need to use this information in the course of their authorized duties for Brown & Brown; (b) repeatedly advising its employees with access to this

information that they must maintain its confidentiality; (c) requiring employees with access to this information to sign confidentiality agreements and restrictive covenants; and (d) maintaining this information on computer systems which have security features designed to protect this information from unauthorized disclosure and which specifically remind the employees with access to this information that such information is confidential and must be protected.

60. The aforementioned trade secrets and other confidential and proprietary information were not (and are not) known to the general public, nor did the general public have access to them. This information is critical to Brown & Brown's economic well-being, and if misappropriated, Brown and Brown's competitors could use this information to gain an economic and competitive advantage over Brown & Brown, thus damaging Brown & Brown.

61. One of the primary objectives of Patel's job was to help grow Brown & Brown's business in connection with its acquisition of Amity, including by increasing and improving Brown & Brown's goodwill with its new clients.

62. Brown & Brown furthered these objectives by encouraging Patel to develop unique and personal relationships with its clients so that they would deal directly with Patel to address their needs associated with Brown & Brown's business and services.

63. During Patel's tenure with Brown & Brown and Amity, Patel developed significant client relationships with a number of entities on Brown & Brown's behalf.

64. As a result of these relationships, certain clients identified with Patel and associated Brown & Brown's business (including through Amity) with him.

65. Brown & Brown encouraged continued development of these relationships at its expense because Patel had entered into restrictive covenants with Brown & Brown.

***Patel's Post-Employment Misconduct; Flow's Tortious Interference***

66. On or about May 1, 2024, Patel resigned from Brown & Brown and, upon information and belief, immediately commenced employment as an insurance agent with Flow.

67. Flow competes directly with Brown & Brown by, among other things, selling insurance products similar to those offered by Brown & Brown.

68. Upon information and belief, Patel shared the Agreement, including the details of the restrictive covenants, with Flow at or before the beginning of his employment with them.

69. Upon information and belief, Flow is actively soliciting insurance clients, including Brown & Brown's clients who were directly serviced and pitched by Patel, together with Patel.

70. Upon information and belief, upon beginning his employment with Flow, Patel immediately began conspiring to flout the restrictive covenants contained in Section 5 of the Agreement by soliciting work from Restricted Accounts (*e.g.,* Brown & Brown clients for which Patel provided direct insurance services), accepting work provided by some such Restricted Accounts.

71. Upon information and belief, Patel, in his directly competitive role with Flow, has also misappropriated and disclosed Brown & Brown's trade secrets, confidential information, and/or proprietary information to Flow, either directly or indirectly (including by and through its agents), to secure a competitive advantage over Brown & Brown in violation of his obligations to Brown & Brown.

72. Upon information and belief, Defendants have also used Brown & Brown's confidential and proprietary information to solicit the Plaintiff's customers in direct violation of the Agreement.

73. Following notification to Brown & Brown about Patel's solicitation of its clients, on or about July 30, 2024, Brown & Brown sent Patel the Cease & Desist Letter attached as

**Exhibit B,** notifying him about the restrictive covenants contained in the Agreement and Brown & Brown's awareness of the ongoing breach. A courtesy copy of the Cease & Desist Letter was also sent to Flow.

74. When presented with evidence of their misconduct, the Defendants demonstrated an unwillingness to cease their unlawful conduct by continuing to solicit the Plaintiff's clients and causing an additional 78 other insurance contracts to be moved to Flow.

75. Upon information and belief, as of the date of the filing of this Complaint, the Defendants are violating, and continue to violate and/or tortiously interfere with, the restrictive covenants contained in the Agreement and have made no effort to cease their impermissible conduct.

76. The Defendants' conduct has caused and will continue to cause Brown & Brown significant economic and non-monetary harm unless enjoined.

## COUNT I
## BREACH OF CONTRACT

77. Brown & Brown realleges and incorporates by reference paragraphs 1-76 of the foregoing allegations as if fully alleged herein.

78. Patel knowingly and voluntarily entered into a lawful and enforceable Agreement with Brown & Brown.

79. The Agreement contains several restrictive covenants that prohibit Patel from (a) soliciting work from any of the Restricted Accounts; (b) accepting work from any of the Restricted Accounts or otherwise interfering or reducing in any manner with the business relationship between Brown & Brown and any Restricted Accounts; (c) misappropriating Brown & Brown's trade secrets or confidential information; (d) interfering or otherwise taking any action to cause any referral source, insurance carrier, wholesale broker, independent contract, or other

person or entity with a business relationship with Brown & Brown to cease, reduce, or refrain from such business relationship; or (e) directly or indirectly inducing, soliciting, or attempting to influence any Brown & Brown employee to leave Brown & Brown, or otherwise assisting a competitor to hire such an employee. **Exhibit A**, § 5 (a-c).

80. The primary purpose of these restrictive covenants is to reasonably protect Brown & Brown's legitimate business interests, including but not limited to (a) the retention of Brown & Brown's current clients and candidates; (b) the preservation of Brown & Brown's trade secrets, confidential information, and/or proprietary information, including information used to assist in the retention of Brown & Brown's current clients, expand business with Brown & Brown's current clients, and secure prospective clients in the future; (c) the protection of Brown & Brown's investment in training and enhancing Patel's skill and experience; and (d) the protection of the goodwill Brown & Brown has created with its current clients and prospective future clients.

81. The scope of the restrictive covenants is reasonable and necessary to protect Brown & Brown's legitimate protectable interests in its confidential, proprietary, and trade secret information, its current and prospective customer relationships, and the goodwill which is part of the same, and these provisions are valid and enforceable.

82. Upon information and belief, Patel breached his Agreement and its attendant restrictive covenants by (a) misappropriating Brown & Brown's trade secrets, confidential information, and/or proprietary information, and (b) directly or indirectly, attempting to divert business opportunities away from Brown & Brown for the benefit of Flow.

83. Brown & Brown has been damaged and irreparably harmed by Patel's actions, and will continue to suffer harm if Patel's contractual violations are allowed to continue, in an amount to be determined at trial.

## COUNT II
## TORTIOUS INTERFERENCE WITH CONTRACT
### (Against Flow)

84. Brown & Brown realleges and incorporates by reference paragraphs 1-83 of the foregoing allegations as if fully alleged herein.

85. Brown & Brown has an enforceable contractual relationship with Patel, as set forth in the Agreement. *See* **Exhibit A.**

86. Prior to entering into the Agreement, Amity had enforceable contractual relationships with Patel, as set forth in the Option Termination Letter, which was assigned to Brown & Brown as part of the APA.

87. These contracts required or require Patel to refrain from soliciting Brown & Brown's clients and competing unfairly with Brown & Brown.

88. At all times relevant to this Complaint, Flow had actual knowledge of one or more of these contractual relationships.

89. On July 30, 2024, through the Cease & Desist Letter, Brown & Brown provided Flow with a copy of the Agreement, removing all doubt as to their knowledge of the Agreement's existence and contents, and thus, Patel's obligations to Brown & Brown. *See* **Exhibit B.**

90. Nonetheless, the Defendants conspired together to continue soliciting and accepting work from Brown & Brown's clients, including the Restricted Accounts.

91. Flow's interference with Patel's contractual obligations to Brown & Brown was not privileged or in any way justified, and was conducted with the improper purpose of competing unfairly with Brown & Brown.

92. Accordingly, Flow intentionally and unjustifiably interfered with, and continues to interfere with, the Agreement by inducing Patel to solicit Restricted Accounts.

93. Brown & Brown has been damaged and irreparably harmed by Flow's actions and will continue to be damaged if Flow continues to tortiously interfere with Patel's contract with Brown & Brown, in an amount to be determined at trial.

## COUNT III
## MISAPPROPRIATION
**(Against All Defendants)**

94. Brown & Brown realleges and incorporates by reference paragraphs 1-93 of the foregoing allegations as if fully alleged herein.

95. Brown & Brown possesses confidential and proprietary information which is protected through policies, trainings, and security measures designed to protect against unauthorized disclosure, as described in greater detail above.

96. Upon information and belief, Patel improperly retained Brown & Brown's confidential and proprietary information following the end of his employment with Brown & Brown.

97. Upon information and belief, Patel has, and will continue to, disclose this information to Flow in order to gain a competitive advantage over Brown & Brown. In so doing, Patel has misappropriated Brown & Brown's confidential and/or proprietary information, and Patel's misappropriation was without justification, excuse, or consent.

98. Brown & Brown has been damaged and irreparably harmed by Patel's actions and will continue to be damaged in an amount to be determined at trial if Patel continues to misuse Brown & Brown's confidential information, including to solicit Brown & Brown's clients.

## COUNT IV
## TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS RELATIONSHIPS
**(Against All Defendants)**

99. Brown & Brown realleges and incorporates by reference paragraphs 1-99 of the foregoing allegations as if fully alleged herein.

100. Brown & Brown had contractual relationships with the Restricted Accounts, as defined herein.

101. Patel knew about Brown & Brown's contractual relationships with the Restricted Accounts because of his direct role in arranging for the contracts between Brown & Brown and the clients constituting the Restricted Accounts, and based on the Restricted Accounts' Certificate of Liability Insurance forms.

102. Moreover, the relationships the Restricted Accounts had with Brown & Brown would also be apparent from the Restricted Accounts' existing Certificate of Liability Insurance forms, which insurance companies generally review in the process of selling customers new insurance products.

103. With general and specific knowledge of the Restricted Accounts and their contractual relationships with Brown & Brown, Defendants intentionally and unjustifiably interfered with these contractual relationships by using Brown & Brown's confidential information in order to induce the Restricted Accounts to cease doing business with Brown & Brown and begin doing business with Flow.

104. Brown & Brown has been damaged and irreparably harmed by Defendants' actions and will continue to be damaged if Defendants continue to tortiously interfere with the contracts of the Restricted Accounts, in an amount to be determined at trial.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for relief as follows:

105. For judgment in favor of Plaintiff and against Defendants on all counts;

106. Damages, including compensatory, exemplary and punitive, damages, in an amount to be determined at trial;

107. Costs, expenses and attorney's fees;

108. Pre-judgment and post-judgment interest at the legally allowable rate on all amounts owed; and

109. All other and further relief deemed just and proper by the Court.

## DEMAND FOR JURY

Plaintiff demands trial by jury on all issues triable as a matter of right at law.

Dated: December 2, 2024

Respectfully Submitted,

*/s/ Christopher M. Pardo*
Christopher M. Pardo
Email: cpardo@HuntonAK.com

HUNTON ANDREWS KURTH LLP
60 State Street, Suite 2400
Boston, Massachusetts 02109
P: (617) 648-2759
F: (617) 433-5022

*Attorneys for Plaintiff*
*Brown & Brown, Inc.*

056008.0000049 DMS 308394485v2